# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| SEAN F. LYNCH | § | |
|      **PLAINTIFF** | § | |
| | § | |
| | § | |
| | § | CIVIL ACTION NO: 4:21-cv-234 |
| **VS** | § | (JURY) |
| | § | |
| | § | |
| Amazon.com Services, INC | § | |
|      **DEFENDANT** | | |

## PLAINTIFF SEAN F. LYNCH ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff Sean F. Lynch filing his Original Complaint against Amazon.com Services, LLC (hereinafter Defendant or Amazon), and in support thereof would show as follows:

### I.    Preliminary Statement

    1.   This is a lawsuit charging Defendant Amazon with intentionally subjecting Plaintiff to a hostile work environment resulting from racial discrimination, bullying and retaliatory harassment in response to multiple complaints regarding the same.

    2.   It charges that Defendant engaged in targeted behaviors, deceit, unethical and other improper conduct intended to negatively skew Plaintiff's work performance and his reputation, to include but not limited to:

        a) manufacturing false, misleading, and/or exaggerated claims.

        b) using intimidation tactics, ridicule, trivializing Plaintiff's work, and demeaning him,

Plaintiff's Original Complaint

c) overly scrutinizing and manipulating Plaintiff's work in a manner not experienced by other managers, to effectively bully him out the door,

d) defining underperformance in an unreasonable and/or improper manner, and

e) by manipulating complaint processes, to include but not limited to using Plaintiff's protected activity to manufacture theories of underperformance.

3.   This lawsuit illuminates the Defendant's mindset that work performance allegations need not be validated, that false allegations can be made with impunity, and then be used to apply the death penalty to one's career.

4.   The lawsuit describes an abuse of power and an abuse of various administrative processes, to force Plaintiff to improperly be held to account for the intended consequences of the bullying.

5.   It charges defendant facilitated Plaintiff's placement in various administrative programs to address work performance issues in bad faith.

6.   This lawsuit illuminates Defendant's mindset concerning black employees, like Plaintiff who are subjected to harassment and report the same.  It demonstrates Defendant's recklessness in addressing matters of bullying tied to work performance claims by its refusal to fully examine Plaintiff's complaints. Instead, it speaks to Defendant's deliberate lack of due diligence and indifference to Plaintiff's complaints.

7.   This lawsuit speaks to an environment in which employees who report improper conduct, ask questions, take actions aimed at protecting the dignity of their work environment and/or preserve the integrity of their work record are blackballed and terminated.

8.   The lawsuit speaks to Defendant's mindset and failures which promote an environment where employees who engage in protected activities stand the chance of the harassment continuing and their health suffering as a result.

9.   The lawsuit speaks of administrative processes which did nothing to protect Plaintiff from being bullied, resulting in a disparate impact on other similarly situated employees.

10. Defendant's failure to promptly and appropriately investigate and respond to and/or mitigate Plaintiff's claims fostered a hostile retaliatory environment for Plaintiff, which allowed the bullying and harassment to continue.

11. Plaintiff was effectively denied a workplace free from harassment, and one which ultimately affected his terms, conditions and privileges of employment.

Plaintiff's Original Complaint

12. Defendant's failure to mitigate resulted in Plaintiff being required to work in a caustic environment.  And, eventually, it resulted in Plaintiff having to seek mental health treatment for the bullying.

13. On more than one occasion, Plaintiff expressed the desire for an accommodation. Ultimately, Plaintiff was fired while engaging in the interactive process, effectively resulting in Plaintiff being terminated  for the mental health/physical harm he suffered at work.

14. Plaintiff remained capable of fully performing the essential functions of his position.

## II.    JURISDICTION, PARTIES and VENUE

15.  The Court has jurisdiction of this lawsuit under 28 U.S.C.§ 1331, as it arises under the Constitution, laws, or treatises of the United States of America.

16. Plaintiff timely filed an administrative inquiry/complaint with the EEOC on or about October 23, 2020.

17. Plaintiff was issued a Right to Sue Letter advising Plaintiff of his right to sue within 90 days.

18. The instant suit is timely filed as it is being timely filed within the 90 days.

19. Venue is proper in this Court under 28 U.S.C.§1391(b)(3), as this is the judicial district in which the defendant is subject to the court's personal jurisdiction with respect to such action.

20. Sean F. Lynch is a natural person, an individual residing in Porter, Montgomery County, Texas.

21. Amazon is a business entity incorporated under the laws of the state Washington, with its principal office in Seattle, Washington. Amazon may be served with service of process at Amazon.com, Inc, Corporation Service Company, 300 Deschutes Way SW, Suite 304 Tumwater, WA 98501 Attn: Legal Department – Subpoena.

## III.    BACKGROUND

22. Possessing a top secret government clearance for over two decades, Plaintiff had a very successful career at the management level in federal law enforcement, prior to being hired by Amazon.

Plaintiff's Original Complaint

23. Plaintiff is a decorated federal law enforcement retiree, security professional, subject matter expert and he possesses the Certified Protection Professional designation.

24. Plaintiff's law enforcement experience ranged from investigations to arrests to trial, project management, fraud, internal and external crimes, supervising teams, task forces, employee misconduct issues, workplace environment investigations, assaults, workplace violence and he was also a certified academy professor.

25. Plaintiff's security experience included a variety of matters involving people, property, physical security and aviation regulatory security compliance.  Plaintiff possessed airport clearances for two airports and was well versed in aviation security protocols. Plaintiff managed a large team of security professionals to include a bargaining unit of uniformed armed security guards.

26. Plaintiff successfully managed multiple facilities, teams, thousands of employees and projects in multiple states.

27. Plaintiff retired early from his federal law enforcement career to pursue the Aviation Security Manager position with Amazon.

28. On July 29, 2019, Plaintiff was hired by Amazon as an Air Cargo Security Manager - KAFW Dallas (aka Amazon Air), to manage the launch of the new Amazon Air Facility in Haslet, Texas, a 24 hour facility. KAFW represents one component of the entire facility which also includes a fulfillment center. Collectively, KAFW employed approximately 1000 employees.

29. Plaintiff was hired at an L5 compensation level. Plaintiff was the first and only African America/Native American male Aviation Security Manager hired by Amazon.  Plaintiff's position eventually entailed managing a team of four L4s and additional contract security personnel, consisting of a maximum complement of approximately 53.

30. On Plaintiff's watch, KAFW was ultimately launched successfully, its success documented in multiple ways. Plaintiff served as the sole Amazon Manager on site throughout.

31. Plaintiff's successes were used as justification for an upgrade in his position to an L6 (which he did not receive) and two additional management positions (L5s) at KAFW.

**Record of complaints**

32. Beginning on or about March 31, 2020, Plaintiff complained of a hostile work environment.  In a discussion with management, Plaintiff complained that he was being bullied by his supervisor who he believed was targeting /sabotaging his career and making false accusations about his work performance because of his race. Defendant failed to initiate any formal investigation into the substance of Plaintiff's complaint.

Plaintiff's Original Complaint

33. Immediately following Plaintiff's complaint, a deluge of negative work performance "issues" that did not exist and had not been communicated or documented prior began to emerge.

34. On or about May, 12, 2019, Plaintiff again complained of hostile work environment concerns. Plaintiff's second complaint was met with no management response.

35. On or about July 29, 2020, Plaintiff filed a complaint on the ethics hotline. He complained of discrimination, bullying, hostile work environment, retaliation, abuse of power/position/policies, corruption of policies, health and safety concerns and lack of due process.

36. In part due to a conflict of interest, Defendant failed to properly investigate the ethics complaint. The ethics investigation was overseen by the same HR representative responsible for "approving" the action(s) Plaintiff complained of. Defendant failed to interview potential witnesses and failed to protect Plaintiff.

37. On or about October 2, 2020, Plaintiff filed a second ethics complaint. Defendant never responded to Plaintiff's second ethics complaint.

38. A short time later, Plaintiff filed a "Bezos" complaint, Defendant failed to do the necessary due diligence as evidenced by the rush to the return of a finding that no violation of Amazon policy occurred.

39. Prior to the filing of his EEO complaint, Plaintiff had complained approximately ten times via various means to local management and/or to various HR representatives. Plaintiff filed his complaint with the EEOC on or about October 23, 2020. On October 27, 2020, Plaintiff received notice that his Bezos complaint had been closed. No further information/explanation provided.

40. Plaintiff was subjected to a hostile work environment in retaliation for filing these complaints and continuing retaliatory harassment thereafter.

## IV.   FACTUAL ALLEGATIONS

41. Defendant used a number of "improper methods" to interfere with Plaintiff's employment, including but not limited to:

**Beginning on or about March, 2020 and continuing thereafter, Plaintiff's supervisor Craig Conard (Craig C.) used work performance as a tool to bully Plaintiff. Defendant deliberately and repeatedly misrepresented facts to undermine Plaintiff's work performance.**

Plaintiff's Original Complaint

42. Craig C. intentionally misrepresented that each and every allegation of underperformance alleged were all true and factually correct when they were not all true and factually correct.

43. Craig C. intentionally misrepresented that Plaintiff suddenly lacked competence to perform the Aviation Security Manager position.

**Beginning on or about June, 2020 and continuing thereafter… To facilitate entrance into PIVOT, placement on a PIP and ultimately Plaintiff's removal, Craig C. intentionally acknowledged and misrepresented…**

44. That Plaintiff possessed no knowledge, skills or abilities that could be utilized anywhere else in Amazon.

45. That Plaintiff could not be rehabilitated within a year.

46. That Plaintiff had a sustained period of underperformance.

47. That ongoing coaching had been provided to Plaintiff without improvement.

48. That ongoing support had been provided to Plaintiff without improvement.

49. That Plaintiff would not be a good fit anywhere else in Amazon.

50. That Plaintiff lacked the knowledge, skills or ability to be an Aviation Cargo Security Manager or manage the site.

51. That Plaintiff had difficulty managing four employees.

52. That Plaintiff was unsuccessful on at least 60% of his tasks or 60% of the time.

**Despite the existence of official system reports, emails and/or other documentation that flat out refutes his claims, beginning on or about March, 2020 and continuing thereafter… Craig C. falsely alleged…**

53. That a variety of work was left incomplete.

54. That work was missed.

55. The receipt of serial complaints/dissatisfaction of internal customers generally.

56. That multiple tasks/projects were left outstanding and oversight was needed to complete.

Plaintiff's Original Complaint

57. That Plaintiff was not accessible to site management.

58. That Plaintiff failed to communicate on one or more matters.

**Beginning on or about March, 2020 and continuing thereafter... Craig C. used intimidation tactics, overly scrutinized, ridiculed Plaintiff, trivialized his work and qualifications and demeaned him.**

59. Craig C. advised another that he used a confidential source(s) to aid in obtaining dirt on the Plaintiff.

60. Craig C. trolled through and used the workplace camera system almost daily as a source to monitor and scavenge for criticisms to unreasonably scrutinize the Plaintiff and/or his team.

61. Craig C. ridiculed Plaintiff's work performance based upon the allegation of serial complaints from internal and external customers, which were none existent.

62. Craig C. required mandates of the Plaintiff, not required of his other manager(s) to include but not limited to:

a) instructing Plaintiff to utilize specific time management measures to include posting his daily tasks on his door, and

b) instructing Plaintiff to post his daily work schedule on his door,

63. Craig C. demeaned Plaintiff by attempting to dumb down Plaintiff's knowledge, skills, and abilities by:

a) allowing little to no management discretion,

b) requiring the escalation of every aspect of the job,

c) calling the Plaintiff double digit times per day to solicit information and/or monitor every aspect of Plaintiff's work,

d)  urging Plaintiff to use a "how to" checklist to manage his employees in place of utilizing management skills honed by the Plaintiff over two decades of experience,

e) reducing Plaintiff's responsibilities to being responsible for no more than following the site manager around "like a hawk,"

Plaintiff's Original Complaint

f) using vague, random, non specific, unreasonable expectations - refusing to set SMART goals.

g) refusing to answer any of Plaintiff's inquiries regarding Craig C's work performance claims,

h) fostering an atmosphere where the mere utterance of Plaintiff's underperformance was sufficient to make it so, without the necessity of any support.

i) using Plaintiff as a scapegoat for systemic issues beyond his control.

j) using Plaintiff's personal/family time to foster additional claims of underperformance.

64. Plaintiff was advised by his immediate supervisor that he would do anything to anybody to preserve his own status and retirement with Amazon to include firing anyone.

65. A quote was added to Plaintiff's supervisor's signature line which Plaintiff believed was intended to minimize/mock Plaintiff's qualifications for the job.

66. Craig C. failed to treat Plaintiff with dignity and respect.

**Beginning on or about March, 2020 and continuing thereafter...Craig C's characterization of Plaintiff's underperformance was unreasonable and improper.**

67. In connection with the timing of data entry or technical glitches, Plaintiff was ridiculed for seconds.

68. Representative of Plaintiff's underperformance also included holding Plaintiff exclusively accountable for:

69. Following specific directions of other superiors/ higher level managers.

70. Acts of God.

71. Matters within the exclusive control of other departments and/or stakeholders.

72. Systemic wide problems.

73. False claims.

74. Unexplained "bullets" supposedly representative of underperformance, without support or explanation, leaving Plaintiff to guesstimate.

Plaintiff's Original Complaint

75. Activities of contract labor beyond Plaintiff's control.

76. The timing of Craig C.'s own rule changes (i.e. changes in program start and stop dates).

77. For Craig C's own errors and/or omissions.

78. Craig C. refused to acknowledge the interplay of all existing countermeasures in the context of analyzing security concerns.

79. Craig C. frequently assigned Plaintiff to drop everything and handle a collateral duty (STAs), while simultaneously penalizing work from which Plaintiff's attention may have been temporarily diverted.

80. Where Craig C. failed to provide Plaintiff the tools he needed to perform his job and/or a specific task, Plaintiff was held to be deficient.

81. Plaintiff's criticisms came without regard to workplace dynamics operating in a pandemic environment.

**Beginning on or about March, 2020 and continuing thereafter Craig C. manipulated Plaintiff's use of the complaint process and used his protected activity as an example of underperformance.**

82. Craig C. and others discouraged Plaintiff from defending himself against the bullying both verbally and in writing. Plaintiff was instructed by management, the local HR rep, and out of state HR representatives to just listen and take "any and all feedback," in other words just shut up and take it.

83. Craig C. and others discouraged Plaintiff's attempts to protect himself from being bullied by:
a) using Plaintiff's defensive and protective posturing (writing emails, challenging the false claims, making complaints, etc.) to suggest a systemic pattern of Plaintiff's conduct,

b) fostering the claim that such protective measures were not that but rather further indicative of a problem employee,

c) by referencing Plaintiff's own complaints of hostile work environment and discrimination to substantiate Craig C's claim of underperformance,

d) by citing "investigation" as one "bullet" representative of Plaintiff's underperformance.

Plaintiff's Original Complaint

**Beginning on or about April, 2020 and continuing thereafter... Defendant manipulated and abused various administrative programs to undermine Plaintiff's performance.**

84. Craig C. bullied Plaintiff into three different performance improvement tracks - FOCUS, PIVOT, and then PIP. Plaintiff's placement in each of these programs was premised upon the legitimacy of the underlying claims, all of which were presumed to be true, but they were not.

**Plaintiff was entered into FOCUS without his knowledge.**

85. On or about July 24, 2020, contemporaneous with Plaintiff's placement in the PIVOT program below, Plaintiff first learned that Craig C. had reportedly entered Plaintiff into FOCUS some two months prior on or about (April 2, 2020) and that he had been found unsuccessful, for reasons that were not disclosed to Plaintiff.

86. The FOCUS entry was allegedly entered two days after Plaintiff's first complaint to management.

87. Craig C.'s FOCUS entry consisted of a  few bullet points with no further explanation attached.

88. No prior discussions were had and Plaintiff received no documentation concerning his placement in FOCUS.

89. Craig C. repeatedly refused to respond to Plaintiff's requests for explanation and/or how each of the bullets rose to the level of Plaintiff's underperformance.

90. Craig C. and others repeatedly refused to explain how the alleged bullet points later justified Plaintiff's entrance into PIVOT.

91. Craig C.and others repeatedly ignored Plaintiff's attempts to offer any clarity of  his own.  The Defendant(s) never responded to any of Plaintiff's emails and repeatedly denied Plaintiff's request(s) for response(s) about his performance in writing.

92. Defendants failed to initiate any investigation into Plaintiff's claims.

**Meanwhile, during the same time period, Craig C. simultaneously held Plaintiff out as qualified to perform another job at Amazon.**

93. Later in April, 2020, Plaintiff notified Craig C. of his interest in applying for a Loss Prevention Site Lead position. He did not object.  No performance issues were communicated before, during or after which would otherwise have rendered Plaintiff unqualified for consideration.

Plaintiff's Original Complaint

94. Craig C. later expressed that Plaintiff was "well qualified for the job" and advised he "could have helped him get that job."

95. Yet, less than two months later, Plaintiff would become regarded as an employee with a "sustained period of underperformance, who could not be rehabilitated or perform another job at Amazon.

**Plaintiff was entered into PIVOT, a second administrative program for underperformers. Based on Defendant's own regulations, Plaintiff was not a suitable candidate for this program.**

96. On July 24, 2020, Plaintiff was "PIVOTED" by email. Plaintiff later received a telephone call from management and he was abruptly told to "read it and that [he] could just resign right now."

97. Plaintiff's supervisor indicated work performance concerns arose in January, 2020 in connection with a specific project (ULD). However, the project did not occur until some six months later.

98. The PIVOT entry occurred approximately 2 ½ months following Plaintiff's second complaint to management. Craig C. cited over 20+ bullets as indicative of Plaintiff's underperformance. Craig C. and others refused to provide any explanation.  Plaintiff was to remain in PIVOT until on or about August 28, 2020.  This was the very first time Plaintiff became aware of PIVOT. It was the first time Plaintiff had received any written reference to him being regarded as an underperformer.

99. Both management and HR approved of the all details of the PIVOT entry, in form and in substance.

100. Amazon regulations provide that PIVOT is for employees with "sustained periods of underperformance despite coaching and support from their manager," who can not be rehabilitated within a year and whose skills can not be used elsewhere in Amazon. Management refused to respond to Plaintiff's repeated inquiries seeking feedback from management concerning how he met these thresholds.

101. The PIVOT document offered Plaintiff no clear and concise expectations or objective measurements of performance - no SMART goals.

102. Plaintiff complained to HR and submitted numerous procedural and substantive questions. HR repeatedly refused to answer any and all substantive questions.

103. Plaintiff's first ethics hotline complaint resulted in the PIVOT process being temporarily halted. Plaintiff was then advised that an investigation into his ethics complaint

Plaintiff's Original Complaint

would be overseen by the same HR represented that approved the PIVOT entry - an obvious conflict of interest.

104. Craig C. and others refused to answer any of Plaintiff's questions verbally or in writing, throughout the remainder of the process.

105. A PIVOT entry limited Plaintiff's future job/promotional opportunities and/or transfers.

106. Defendants offered no process to appeal placement in PIVOT.

107. On August 25, the PIVOT process resumed.  HR took no steps to validate Plaintiff's claims. Plaintiff was advised that he was found unsuccessful on the PIVOT.

108. On or about August 31, 2020, Plaintiff was given the "choice" of being forced to resign, placemed on a PIP for 30 days or more, or defaulting to the latter if he elected neither.

**On or about September 30, 2020, Plaintiff was placed on a PIP based on further claims Defendants refused to validate.**

109. On or about Septembet 2, 2020, Plaintiff  was automatically defaulted to the PIP. The PIP was expected to end October 2, 2020.

110. Upon presentation of the PIP document to the Plaintiff, HR representative Anna Lyons advised, "I have no doubt you will be successful on the PIP."

111. Plaintiff's supervisor offered no list of specific tasks, expectations, guidance or deadlines throughout the entirety of the PIP.

112. The PIP was an exercise of observation of whatever work the Plaintiff initiated on his own.

113. Craig C's use of the PIP process was done in bad faith. It was not designed such that it would give any similarly situated employee a legitimate opportunity to improve.

114. Throughout intermittent feedback sessions with management and HR, Plaintiff  was repeatedly instructed to essentially shut up and just "accept any and all feedback."

115. All attempts by the Plaintiff to interact, clarify, or defend his record were discouraged, unwelcomed, and used against him.

116. Plaintiff's supervisor planned a trip out of the country during the PIP and appointed two "proxies" to oversee the PIP - Eric Kaler and Juan  Vargas (JP).  Again, no list of specific tasks, goals or expectations were communicated by Kaler.

Plaintiff's Original Complaint

117. And, JP only recommended completion of one task - a letter to Allied Security, which the Plaintiff successfully completed. However, upon Craig C's return, this letter was regarded as yet another deficiency.

118. Craig C. found Plaintiff unsuccessful on the PIP, again based on underlying claims Defendants refused to validate.

119. Craig C. had already prepared the unsuccessful rating document in advance of the time period for conclusion of the PIP.

120. Craig C. presented Plaintiff the unsuccessful rating document one day prior to the close of the PIP period.

121. Once again, Defendant failed to validate the underlying allegations in the PIP, prior to the unsuccessful rating..

**Plaintiff's appeal of the PIP was unsuccessful and based upon yet additional claims not validated.**

122. Approximately nine additional examples were cited on the Management Assessment Form received by Plaintiff in support of the unsuccessful rating he received.

123. During the process of Plaintiff's appeal of the unsuccessful rating, Plaintiff was advised that Craig C. could make no more additions to his appeal package, yet Defendant allowed this to occur.

124. Less than a day before Plaintiff's appeal, a Management Appendix offering additional allegations not made known to Plaintiff were suddenly added.

125. Craig C. then represented that the nine allegations of underperformance now only represented 40+% of Plaintiff's deficiencies.

126. Craig C. suggested there were another 60+% of tasks for which Plaintiff remained deficient, none of which had been communicated to Plaintiff at any time during the PIP process.

**Craig C. racially profiled Plaintiff and used bullying tactics that were SEVERE AND PERVASIVE.**

In addition to all of the above…

127. As a condition of his continued employment, Craig C. bullied Plaintiff into succumbing to three programs for underperformers -  FOCUS, PIVOT and PIP.

Plaintiff's Original Complaint

128. By these actions, Craig C. thwarted Plaintiff's opportunity for transfer and/or advancement to another position in Amazon.

129. Plaintiff was Defendant's only African American and Native American L5 and he was treated differently and more harshly than his non black colleague(s).

130. Plaintiff was advised by Craig C. that he didn't look like someone who was successful.

131. Plaintiff was passed over for an upgrade in his position to an L6, while Plaintiff's colleague, Craig Vargas, received the upgrade.

132. Craig V. had lesser responsibilities in that his facility was not a 24 hour facility. Plaintiff's was.

133. Craig V's facility processed fewer STAs than Plaintiff's facility. Plaintiff was fired. Craig V. was promoted.

134. Craig V.  had no experience successfully launching a new facility, Plaintiff did. Plaintiff was fired and again Craig V. was promoted.

135. Craig C. repeatedly targeted Plaintiff's work performance as the tool for bullying Plaintiff.

136. Plaintiff was subjected to more scrutiny, more pressure, different expectations.

137. Craig C. abused his position of power to bully Plaintiff.

138. Prior to filing his complaints, Plaintiff had never received anything in writing wherein his performance was characterized as underperforming,  unsatisfactory, not meeting expectations or the like.

139. Prior to filing his complaints, nothing had been communicated to Plaintiff regarding the possibility of any impending work performance and/or disciplinary concerns.

**Plaintiff was never afforded sufficient due process. HR refused to engage with Plaintiff on substantive issues at any stage.  Defendant failed to mitigate/protect the Plaintiff.**

140. Plaintiff immediately reported bullying up at least two levels of management and to HR but ultimately he was left to handle the issue predominantly on his own.

141. Local and out of state HR representatives had knowledge of Plaintiff's complaints, and all failed to independently investigate the bullying in relation to the underperformance allegations.

Plaintiff's Original Complaint

142. Management and HR refused to respond to specific substantive questions/concerns communicated by the Plaintiff at various stages in the administrative process.  Plaintiff was both discouraged and prohibited from obtaining answers to any inquiries pertaining to management's claims.

143. Defendant failed to take appropriate steps to prevent or correct the unlawful harassment. Defendant took no remedial action in response to the bullying.

144. Plaintiff was left in a situation where he was required to endure the day to day bullying as no attempts were made by Defendant to mitigate. Defendant provided no preventive or corrective opportunities.

145. Plaintiff's appeals to HR, to the ethics hotline and to the Bezos line were not met with the appropriate level of due diligence.  No one at any level made any attempts to mitigate possible repercussions from bullying.

146. Defendant forced timelines and restrictions on the Plaintiff while simultaneously refusing to effectively engage throughout.

147. Defendant's actions resulted in Plaintiff's termination, failure to promote and loss wages (past and future).

148. Defendant's complaint or grievance process was ineffectual in preventing the same.

149. Defendant was allowed to advance false allegations of work performance with impunity.

150. Defendant fostered an atmosphere where the mere utterance of an employee's underperformance was sufficient to make it so, without the necessity of any support.

151. Plaintiff suffered emotional damage and had to seek medical attention.

**The bullying affected Plaintiff's mental health. Plaintiff sought an accommodation and was fired while engaging in the interactive process.**

152. Upon initially raising claims of discrimination and harassment to Human Resources, Plaintiff inquired about some form of accommodation.  Although existing regulations allowed for Defendant to initiate the accommodation process, they did not do so. Instead, Plaintiff did.

153. On October 4, 2020, Plaintiff submitted a request for an accommodation due to a mental health break-down resulting from being bullied at work.

Plaintiff's Original Complaint

154. Plaintiff began to engage with parties in the Accommodations Department and provided updates accordingly.

155. At some point, Plaintiff advised he was awaiting an appointment in order to obtain additional medicals, Defendant advised Plaintiff that he was essentially being removed from the medical accommodations track and instead being placed in non-medical, straight leave of absence track. Plaintiff was advised that once he received his additional medicals, that he would then be returned to the medical accommodations track.

156. Despite a request for medical leave, on or about October 7, 2020, Defendant was advised of receipt of Plaintiff's request "leave of absence."

157. Plaintiff later provided additional medicals.

158. On or about October 29, 2020, Plaintiff received a request for additional information from the Accommodations department.

159. By letter dated October 30, 2020, Plaintiff received a Decision Notification approving his FMLA/Medical Leave of Absence from October 4 thru October 28th.

160. One day following a request for additional information from Accommodations, Plaintiff was terminated from employment with an effective date of October 30, 2020.

161. Immediately thereafter, Plaintiff contacted Accommodations with no response.

162. Plaintiff's mental health and resulting leave were repercussions inextricably intertwined with the myriad of baseless work performance claims used as the tool for bullying the Plaintiff.

163. Defendant lacked a legitimate lawful independent basis for Plaintiff's termination. Plaintiff was otherwise fully capable of performing the essential functions of the position.

**POST TERMINATION**

164. Three people were hired to replace Plaintiff at KAFW, two L5s and one L6.

165. In addition, collateral duties once performed by Plaintiff aided in substantiating the hiring of approximately 60 additional contract tracers.

166. Plaintiff's future law enforcement/security career opportunities have been severely impacted as a result of his termination.

Plaintiff's Original Complaint

## V.    CAUSES OF ACTION

### A.  VIOLATION - TITLE VII, Civil Rights Act of 1964, as codified , 42 U.S.C. § 2000e to 2000e-17 (race).

167. Plaintiff repeats and realleges by reference each and every allegation contained in paragraphs 41 - 166 above and incorporates them all here as though fully set forth.

168. Plaintiff was subjected to the negative job actions herein because of his race.

169. The race based harassment articulated in this complaint was so severe, pervasive, and objectively offensive that it deprived Plaintiff of access to employment opportunities and/or benefits provided by the employer.

170. Defendant  through its agents, supervisors, or employers created and/or subjected Plaintiff to a hostile workplace environment and retaliatory harassment  in violation of Title VII because:

a)  Plaintiff was member of a protected class;

b)  Plaintiff was subjected to harassment in the form of bullying and manipulation of his work performance because of his protected class;

c)  Plaintiff was subjected to harassment based on his race (African American/Native American);

d)  Plaintiff was subjected to retaliatory harassment because of his complaint;

e)  Plaintiff was subjected to a hostile work environment created by Defendants ignoring its own policies and procedures, the lack of appropriate safeguards in its policies and procedures and Defendant's failure to properly investigate and/or address the bullying and discrimination claims and subsequent harassment.

f)  Plaintiff was forced to endure unwelcomed, intimidating behavior.

g)  Defendant was aware and did nothing to prevent and/or mitigate.

171. Defendant's officials had actual knowledge of the racial discrimination and harassment beginning March, 2020 but failed to investigate and/or discipline Plaintiff's harasser in a timely manner consistent with federal and state law.

172. The Defendant's failure to properly and appropriately respond to the alleged racial discrimination harassment resulted in Plaintiff, on the basis of his race, being excluded from

Plaintiff's Original Complaint

participation in, being denied benefits from, and being subjected to discrimination in the Defendant's workplace in violation of Title VII of theCivil Rights Act of 1964.

173. Defendant failed to take immediate, effective remedial steps to resolve the complaints of racial harassment and instead acted with deliberate indifference toward Plaintiff.

174. Defendant persisted in its actions and inaction even after it had knowledge of the harm suffered by Plaintiff.

175. Defendants engaged in a pattern and practice of behavior designed to discourage the Plaintiff from seeking protection and from seeking to have the bullying and racial discrimination from being fully investigated.

176. This pattern and/or practice constitutes disparate treatment of black males like Plaintiff and has a disparate impact on African American/Native American employees similarly situated in general.

177. Plaintiff has suffered financial loss, emotional distress, psychological damage, and his character and standing in the law enforcement/security community has suffered from the harassment fostered as a direct and proximate result of Defendant's deliberate indifference to his rights under Title VII.

**B.  VIOLATION - COMMON LAW THEORY OF TORTIOUS INTERFERENCE WITH EMPLOYMENT**

178. Plaintiff repeats and realleges paragraphs 41 - 166 in support.

**C.  VIOLATION - COMMON LAW THEORY OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

179. Plaintiff repeats and realleges paragraphs 41 - 166 in support.

**D.  VIOLATION - DEFAMATION - TEXAS CIVIL PRACTICE AND REMEDIES CODE, Title 4, Chapter 73**

180.  Plaintiff repeats and realleges paragraphs 41 - 166 in support.

**E.  VIOLATION - FMLA - TITLE 29 U.S.C. 2601**

181. Plaintiff repeats and realleges paragraphs 41 - 166 in support.

Plaintiff's Original Complaint

## VI.    DAMAGES

182.  Defendant's conduct constitutes violations of statutory and/or common law. Such unlawful conduct seriously affected Plaintiff in his occupation. Because of Defendant's unlawful conduct, Plaintiff has suffered, suffers, and will continue to suffer financial loss, humiliation, mental anxiety and stress, and other damages. Plaintiff has suffered direct injury as a proximate result of the unlawful discriminatory practices, policies, and procedures of Defendant. Accordingly, Plaintiff seeks all general, special, incidental and consequential damages in an amount to be proved at trial.

183.  Because of Defendant's unlawful and tortious conduct, it has been necessary for Plaintiff to retain an attorney to represent him in these causes of action Plaintiff has agreed to pay reasonable attorney's fees for the preparation of trial of these causes, and further for any appeal thereof should same become necessary.

184..  Additionally, Plaintiff has incurred out of pocket expenses, which include litigation costs and other expenses to preserve his ability to earn a living. Accordingly. Plaintiff seeks all general, special, incidental and consequential damages as shall be proven at trial.

185.  Further, Plaintiff seeks pre-judgment interest at a rate commensurate with the actual rate of interest in the marketplace or, alternatively, the statutory rate of interest because of the delay in receiving the damages and to avoid unjust enrichment to Defendant.  Plaintiff also seeks post-judgment interest at the maximum rate allowed by law in the event that Defendant does not promptly tender damages assessed against them and to avoid unjustly enriching Defendant.

## VII.    JURY DEMAND

186. Plaintiff hereby demands that all eligible claims be tried to a jury.

## PRAYER FOR RELIEF

WHEREFORE, premises considered, Plaintiff prays that Defendant be cited to appear and answer herein, and that on final trial, Plaintiff have judgment against Defendants for:

All damages to which Plaintiff may be entitled pursuant to this Original Complaint, or any amendment(s) thereto, including but not limited to back pay, reinstatement or front pay in lieu of reinstatement, loss of earnings in the past, loss of earning capacity in the future, loss of benefits in the past, statutory relief at law, and equity;

Actual, compensatory, and punitive damages for pain and and mental suffering in the past and future;

Plaintiff's Original Complaint

Punitive damages resulting from the negative impact to professional standing and future job competitiveness.

Permanent injunction enjoining Defendant, its agents, successors, employees, and those acting in consort with Defendant from engaging in any practice which discriminates on the basis of race and protected complaints.

Reasonable attorney's fees, with conditional awards in the event of an appeal;

Pre-judgment interest at the highest amount permitted by law;

Post-judgment interest from the judgment until paid at the highest rate permitted by law;

Costs of court and expert witness fees incurred by Plaintiff in the preparation and prosecution of this action; and

Such other and further relief, at law or in equity, to which Plaintiff may be entitled, whether by this Original Complaint or by any amendment hereto.

Dated: January 25, 2021

Respectfully Submitted,

LAW OFFICE OF TAMMIE Y. MOORE

By: _Tammie Y. Moore_
Tammie Y. Moore
Texas State Bar No: 00798385
P.O. Box 5743
Kingwood, TX 77325-5743
(832)356-7144 (Telephone)
tymoorelaw@gmail.com

Plaintiff's Original Complaint

20

**CERTIFICATE OF SERVICE**

I, Tammie Y. Moore, hereby certify that a copy of the foregoing Complaint will be timely served on all Defendants in accordance with the Federal Rules of Civil Procedure.

Tammie Y. Moore